# FOR PUBLICATION

FILED & ENTERED

JAN 06 2022

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY egonzale DEPUTY CLERK

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SAN FERNANDO VALLEY DIVISION

In re:

Claudia Cadena

                                    Debtor(s).

Case No.: 1:21-bk-10082-MT

CHAPTER 7

**MEMORANDUM OF DECISION RE: DEBTOR'S MOTION FOR AN AWARD OF ATTORNEY'S FEES, COSTS, AND DAMAGES PURSUANT TO 11 U.S.C. § 303(i) AND DEBTOR'S MOTION FOR SANCTIONS PURSUANT TO F.R. BANKR. P. 9011.**

Claudia Cadena, her husband Hugo Marquez, and Cadena's children are former occupants of real property located at 5529 Van Alden St, Tarzana, California 91356 (the "Property"). The Property was encumbered with two (2) deeds of trust ("DOT") in favor of "EIJ" dba Beverly Hills Watch Company 401K Profit Sharing Plan ("EIJ"). Vista Land, LLC, with Mark Wong as its principal, acquired the 2nd DOT through a trustee foreclosure sale on or around September 8, 2020.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Soon thereafter, Vista Land commenced an unlawful detainer proceeding [LASC Case No. 20VEUD00943] to evict Cadena, Marquez, and Cadena's children. On January 20, 2021, Vista Land was able to successfully evict them from the Property. On that same day, Luigi Interlandi through his attorney Michael Shemtoub, filed an involuntary bankruptcy petition ("Petition") against Cadena. Docket 1[1]. Two weeks later, Cadena filed a motion to dismiss the involuntary bankruptcy case and request for an evidentiary hearing on bad faith and to award attorney's fees, costs, and damages against Interlandi and Shemtoub. Docket 6. Interlandi and Shemtoub filed responses. Docket 14 & 16. The motion to dismiss was granted and the Court retained jurisdiction to determine sanctions and to award fees and costs. The dismissal order was entered on March 5, 2021. Docket 24.

An evidentiary hearing was set on the request for damages and sanctions. Parties were directed to submit a list of exhibits and witnesses, pre-hearing briefs, and declarations to serve as direct testimony. At the hearing Cadena, Marquez, Glenn Calsada, and Doug Minor testified on behalf of Cadena. Cadena and her witnesses adopted their declarations as their testimony and were cross-examined. Interlandi and Kevin Moda testified on behalf of Interlandi and were cross-examined. Interlandi submitted a declaration which he adopted as his testimony. Moda did not submit a declaration but was permitted to testify in a limited capacity as a rebuttal witness. Interlandi also submitted declarations of Payman Taheri, Chris Eskijian, Wong and Pamela Mozer. These witnesses never appeared at the hearing and their declarations are not considered because Cadena did not have an opportunity to cross examine them. Shemtoub, representing

---

[1] All docket citations are to the number on the CM/ECF docket of the case, 1:21-bk-10082-MT and sometimes followed by the page number in that pleading. All Exhibit numbers are exhibits introduced during the hearing on this matter.

1
2
himself, filed a declaration and adopted his declaration as his testimony and was cross-examined.[2]

3
4
5
6
7
8
Having considered all pleadings, exhibits and testimony received both through declarations and at the hearing, and all other matters of the record before the Court, the Court makes these findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, made applicable here by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

9
### *Findings of Fact*

10
11
12
13
14
15
16
17
18
19
20
21
22
This involuntary bankruptcy case was commenced for wholly improper purposes. The case did not satisfy even the most basic requirements needed for an involuntary petition, most notably, no one showed there was a debt owed by the putative debtor. Based on the testimony of all the parties, Cadena never owed a debt to Interlandi. Further, based on Interlandi's and Shemtoub's testimony, Eskijian asked Interlandi to collect a debt that Cadena owed Eskijian, thereby assigning Eskijian's claim to Interlandi. Question 12 of Official Form 105, the form used for filing an involuntary bankruptcy petition, asks if there has been a transfer of any claim against the debtor by or to any petitioner, and if yes then all documents evidencing the transfer must be attached. Question 12 was not filled out and no evidence of a debt or a transfer was submitted. Exhibit 1. Interlandi never presented evidence of a transfer of a debt to him from Eskijian, or of Cadena owing a debt to either of them.

23
24
25
26
27
Shemtoub testified that he never saw evidence of any debt owed by Cadena and relied on Eskijian's word that evidence would be produced at a later time. Interlandi testified that he never saw any evidence of a debt owed by Cadena; rather, he was asked by Eskijian to do a favor and file this Petition and to help collect a debt from Cadena. Shemtoub also said that he understood

28
---
[2] The Hearing was conducted on July 29, 2021, August 30, 2021, and September 13, 2021.Because of the COVID-19 pandemic, the first 2 days were conducted by stipulation by video over zoom.gov and the last day was in person with solely Interlandi's counsel appearing over zoom.gov.

that Interlandi was an agent of Eskijian. Given the lack of evidence and the testimony of Interlandi and Shemtoub, skipping question 12 in the Petition appears intentional.

Determining the exact reason the petition was filed is not necessary where no legal basis for the petition has been shown, however, some exploration is required to determine the nature of the sanctions to be awarded. The main justification Interlandi and Shemtoub gave for the filing of the Petition is that they wanted to assist Cadena and Marquez efforts in avoiding eviction. This would not be a valid reason to file an involuntary bankruptcy petition. The true reason seems to be a scheme to protect the property interests of AWBCO, LLC ("AWBCO"), although exactly how they thought it would work is unclear. Eskijian is the principle of EIJ, which had at one point owned two DOTs against the Property. Exhibit 2. Vista Land acquired the 2nd DOT (Exhibit 14) and the 1st DOT was assigned to AWBCO (Exhibit 13). It is unclear who the principal of AWBCO is; however, the allegations made in the complaint in Vista Land, LLC v. EIJ, Inc. et al. LASC Case No. 20 STCV47123 ("State Court Case") (Exhibit 2: 28- 44) concerning the assignment of the 1st DOT to AWBCO and the fact that Eskijian had such a prominent role in organizing and filing the Petition suggest that the principal of AWBCO whose interest was trying to be protected had close ties to Eskijian – if not Eskijian himself. Eskijian, Interlandi and Moda seem to be acquainted and involved in business dealings each other. Even though Interlandi is the only listed petitioner, all three of these individuals were instrumental in the filing of the Petition.

This Court is not making any determinations about the litigation in the State Court Case, but pleadings from that case admitted here provide context to what was occurring prior to the Petition being filed. In the State Court Case, Cadena, Eskijian, EIJ, and AWBCO are named defendants and the case relates to the Property. According to the undisputed allegations made by the plaintiffs and based on some of the state court's rulings, after Vista Land purchased the 2nd

DOT, it approached the 1st DOT holder, which was EIJ at the time, to see if it could purchase the 1st DOT. Exhibit 2: 28-44. Subsequently, EIJ transferred the 1st DOT to AWBCO. Exhibit 2:28-44; Exhibit 13. The asking price after that transfer allegedly sky rocketed. Exhibit 2: 28-44. Vista Land then filed suit against EIJ, Eskijian, AWBCO, and Cadena, asserting that the 1st DOT holder, amongst other things, were involved in a scheme to artificially drive up the price of the 1st DOT. Exhibit 2:28-44. Cadena credibly testified that AWBCO and Vista Land feared what each might do next. Vista Land feared that AWBCO would foreclose on the Property thereby wiping out Vista Land's interest in the Property. On the other hand, AWBCO feared that Vista Land would take possession of the Property and put in low paying long term tenants, making the Property undesirable to future buyers.

According to the state court's ruling on a preliminary injunction application, AWBCO had set a foreclosure date for the first DOT for December 15, 2020. Exhibit 2:61. The court granted Vista Land's application for a temporary restraining order to prevent AWBCO from foreclosing on the Property and later granted a preliminary injunction staying the foreclosure until the case was adjudicated. The injunction did not impede Vista Land's right to evict the tenants of the Property. Exhibit 2:60–68. The state court's ruling on the preliminary injunction occurred on January 7, 2021, thirteen (13) days before the Petition was filed. Exhibit 2:60. In the early stages of litigation in the State Court Case, Shemtoub represented EIJ and Marquez and filed a declaration opposing the preliminary injunction, Exhibit 2, Page 23, which was referred to a number of times in the state court's ruling. While the State Court Case is still in the early stages of litigation, Shemtoub appeared in it and was involved in it.

When Eskijian, Interlandi, and Moda became aware that Vista Land was in the process of evicting Cadena on January 20, 2021, they filed the Petition against Cadena to obtain an automatic stay and stop the eviction. Exhibit 1. Cadena did not enjoy the benefit of the automatic

stay. She credibly testified that by the time the Petition was filed at 11:02 am, the eviction was already complete.

Interlandi, Moda, and Shemtoub all testified that Marquez was the reason for why the Petition was filed at all. According to Interlandi, Moda, and Shemtoub, Marquez sought to file an involuntary bankruptcy case to stop the eviction of his family. This narrative is not credible for several reasons. First, the eviction occurred. If Marquez were involved with the filing of the Petition to stop his family from being evicted, then he would have relayed this information to Cadena as she was being evicted from the Property in hopes of stopping the eviction. Instead, Cadena credibly testified that she was unaware of the Petition at the time it was filed. She testified that she spent time at a park considering where to go after her family was evicted and that she first learned of the involuntary bankruptcy case being filed against her when her credit card was denied when she attempted to purchase cupcakes weeks later.

Marquez's testimony was too short to adequately judge his credibility. It appears he had been working with Moda to obtain a hard money loan to buy out one of the trust deeds, but it was not credible that he authorized a bankruptcy filing of any kind. That Vista Land was able to evict Cadena and Marquez supports Marquez's position that he was not involved with the filing of the Petition. Overall, Marquez's testimony did not favor either party and did nothing to clear up the confusion over what Interlandi, Moda and Eskijian's roles were in this scheme.

The defense advanced by Interlandi, Moda, and Shemtoub does not make sense because if the true purpose were to stop the eviction to benefit Cadena then why did she not simply file a voluntary bankruptcy case? Cadena did not have any prior bankruptcy petitions that could have affected an automatic stay, and a putative debtor in an involuntary bankruptcy case does not have any greater rights or protections than a debtor in a voluntary bankruptcy case. There was no need to file an involuntary bankruptcy petition to stop the eviction here.

Moda is the only witness who addressed why Cadena did not file a voluntary petition. According to Moda, Marquez approached him for help in December 2020 to stop an imminent eviction. Moda told Marquez that a voluntary bankruptcy petition was not going to stop an eviction and that the Property was lost. Moda's testimony was not credible on this issue. Moda is not an attorney and his knowledge of bankruptcy law is limited. Also, the timeline given by Moda does not support this testimony. If Marquez sought Moda's help in December 2020, it is puzzling why it took until after the eviction commenced to file the Petition. If this were an emergency filing and Moda's timeline is to be believed, then the Petition would have conceivably been filed earlier – sometime in late December or early January 2021.

Finally, there is no credible evidence or testimony to support Moda's testimony. Moda presented a check that he says Marquez paid him. Exhibit 19. There is no evidentiary value to this check. The check appears to have come from a business account and not Marquez's personal account. Nowhere on the check is Marquez's name or personal information. There were no experts or witnesses familiar with Marquez's signature present to verify that the signature at the bottom of the check was indeed Marquez's. No one questioned Marquez about the check when he testified. There is nothing in the memo line which indicates why this check was written. Finally, there is no date stamp which is usually placed on a deposited check. This check really could have been for anything, made by anyone at any given time. After he listened to other witnesses' testimony, Moda's explanation for why a voluntary petition was not filed was an odd attempt to address a hole in Interlandi's story of why an involuntary bankruptcy petition had to be filed over a voluntary bankruptcy case.

Finally, this defense is not believable because of who the petitioner is. Why did Interlandi file this Petition? If this Petition were truly Marquez's idea and was intended to benefit Cadena, then why would have it mattered that Interlandi was the petitioner? Interlandi claims that

-7-

Eskijian transferred a debt to him so that he could collect from Cadena. If the purpose of this Petition was to merely stop an eviction at Marquez's request, then why was Interlandi asked to do a favor to file this Petition when Eskijian could have done so himself? Based on both Shemtoub's and Interlandi's testimony, Eskijian was instrumental in organizing and filing the Petition. He then distanced himself and the property interest that he sought to protect by using Interlandi to file the Petition. Despite being a critical witness to Interlandi's position, he never showed up to testify even though he filed a declaration. Instead, Eskijian asked Interlandi, a man who does not appear to have any connections with the Property or Cadena, to file this Petition in his place. If Interlandi and Moda's narrative is to be believed, there would have been no need to have transferred a nonexistent debt to Interlandi so he could file an involuntary bankruptcy petition. Marquez sought assistance with the foreclosure from Moda to obtain another hard money loan but his authorization to file an involuntary Petition against his wife is not credible. More significantly, at no point did Interlandi, Moda, or Shemtoub ever reach out to Cadena about filing an involuntary bankruptcy case against her, and Cadena never authorized anyone to file a bankruptcy petition on her behalf.

Cadena credibly testified that she incurred damages because of the Petition. After the Petition was filed, credit cards were closed, and further credit was denied; she had to incur hefty attorney's fees and costs. Cadena seeks damages of approximately $25,000.00 based on loss of credit. At the time of the Petition, she had a credit limit of $21,500.00 in credit cards.

Minor testified as to damages to Cadena's credit score because of the Petition. Interlandi's objection to Minor as an expert witness is overruled. Minor was qualified as an expert witness; the objections as to his qualifications go to the weight of his testimony, not its admissibility. Minor credibly testified as to what goes into a credit score and what would

adversely affect a score. The methodology he used appeared to be in line with industry norms. He testified that certain things may not show up on credit scores – such as hard money loans.

The one area where Minor was not persuasive was his analysis of Cadena's credit score. Minor relied on a credit report provided by Cadena. Both Cadena and Minor testified that she had a pre-Petition credit score of 790. This score is not credible. A letter from Chase Bank denying Cadena a credit card suggests there were more problems with Cadena's credit score than the involuntary bankruptcy case. Further, the eviction from the Property suggests a 790-credit score is too high. Finally, the credit report relied on by Cadena and Minor came from Credit Karma and not one of the major credit rating agencies that measures credit scores. Regardless of the accuracy of the credit score he relied on, Minor credibly testified that an involuntary bankruptcy petition would negatively affect a person's credit score significantly – a hundred-point deduction or more. He also did not seem aware of other events in her life that likely would have affected her credit score.

Minor testified that Cadena had an outstanding balance of $6,037 that she owed on credit cards at the time of filing. These credit cards were directly closed due to the bankruptcy. Cadena also seeks damages because Chase Bank later denied her a credit card. Minor testified that it would have been a credit line of $4,000.00 that Cadena was denied. Based on the letter Chase Bank sent Cadena, which was submitted in support of Minor's testimony, the basis of the denial of a credit card was because there were "[t]oo many recent requests for credit or reviews of your credit." Towards the end of the letter, it lists the key factors that adversely affected Cadena's credit. These factors were: the number of requests for new credit in the past 3 months; number of requests for new credit in the past 12 months; total available credit on credit cards; and insufficient installment loan information. While Minor credibly testified that a bankruptcy case would negatively impact a credit score and it appears Chase Bank considered Cadena's Credit

Score, the basis for the denial of a credit card appeared to be the number of requests for a new credit card by Cadena.

Interlandi was not a credible witness. He frequently avoided answering questions by saying "I don't know" or that he could not remember. Interlandi appears to be an intelligent individual capable of remembering key events. Testifying that he does not know or could not remember as to basic questions on recent events suggests that Interlandi was wanting to avoid answering the questions. He could not confirm that Shemtoub represented him in the filing of the Petition and insisted that he signed the Petition in person when the signature appears to be an electronic signature. It also appears Interlandi either was not very involved in the drafting of his declaration which he adopted as his testimony or was not familiar with it to the extent he should have been. Interlandi's story seemed scripted, and he avoided answering selective questions to prevent deviating from the script or to avoid implicating others. Interlandi frequently would look at Moda when he answered questions.

Shemtoub is an experienced bankruptcy attorney, testifying that he has thirteen years of experience filing hundreds of bankruptcy cases. Shemtoub claims to have forgotten critical details leading up to the filing of the Petition – such as who paid him and whether he performed research before filing the Petition. Shemtoub testified that he received a panicked call from a group of individuals seeking to immediately file the Petition to stop an eviction; therefore, he did not have sufficient time to investigate the details. Shemtoub's testimony made it seem like he had no knowledge whatsoever of what was occurring prior to this panicked phone call. This was not persuasive because Shemtoub represented EIJ in the State Court Case well before filing the Petition. His sworn declaration in opposition to Vista Land's preliminary injunction shows that he had detailed knowledge regarding the history of the Property. Exhibit 2: 23-26. Further, EIJ's principal, Eskijian, was involved in conversations planning this involuntary bankruptcy case.

While representing EIJ, Shemtoub must have known some of the concerns that Eskijian had about Vista Land and the Property. These facts indicate Shemtoub was much more knowledgeable about the facts leading up to the filing of the Petition than he testified to. Shemtoub's recollection of who was on the call seemed to vary as his testimony went on. Shemtoub at times testified that Eskijian, Marquez and Interlandi were on the phone call, and then at times suggested Moda was there either in addition to these three individuals or Moda was there in place of one of these three individuals.

Interlandi attempted to call Deputy Sheriff Lutz as a witness who handled the eviction. Interlandi tried to have Lutz testify to a phone call he received from an attorney, but no evidence was presented that the attorney represented Cadena. To the contrary, it appeared the attorney may have been hired by Moda. The hearsay testimony was not permitted and there was no purpose served by having Lutz testify as there was no dispute that Cadena and her family were evicted.

Moda testified last. Without anyone notifying the Court that Moda was going to testify, Moda sat in the back of the courtroom and watched the entirety of Interlandi's testimony. He was not listed on Interlandi's witness list and Interlandi's counsel did not inform the Court that he had the intention of calling Moda until he called him to testify. There were several witnesses testifying to specific events and there were concerns about corroboration of events. Based on everyone's testimony, Moda was instrumental in the filing of this involuntary bankruptcy petition – Moda's own testimony supports this as well. Since both Moda and Interlandi were instrumental in the filing of this bankruptcy petition it would have been important to hear Moda's unfiltered testimony before he listened to the other witnesses and to hear Interlandi's testimony without Moda watching him.[3] As found previously, Interlandi's version of events was

---

[3] It is possible that Moda viewed other witnesses testify remotely as well. During the remote testimony there were multiple Zoom tiles listed as "Interlandi" and other parties connected to Interlandi in some way that claimed to be

a scripted story that is questionable at best. Moda was not a credible witness and his answers seemed scripted.

### *Section 303(i)*

A bankruptcy court may award fees, costs, or damages to an involuntary debtor under 11 U.S.C. § 303(i).  Under § 303(i)(1), there are "…only two prerequisites for an award of fees, costs, or damages…(1) the court must have dismissed the petition on some ground other than consent by the parties; and (2) the debtor must not have waived its right to recovery under the statute."  Higgins v. Vortex Fishing Sys., Inc. 379 F. 3d 701, 705-6 (9th Cir. 2004).  Once the prerequisites are satisfied, bankruptcy courts must exercise "some form of discretion in awarding fees and costs."  Id.

There is a rebuttable presumption that reasonable fees and costs are authorized. Higgins, 379 F. 3d at 707.  An award of attorney's fees and costs should be for necessary work performed in defending against the involuntary petition and the work and the fee must be reasonable. *See* In re Wavelength, Inc., 61 B.R. 614, 621(B.A.P. 9th Cir.1986). An award should be based on detailed accounts of services rendered. Id. In deciding whether to award fees, a court considers the "totality of the circumstances," including "1) 'the merits of the involuntary petition,' 2) 'the role of any improper conduct on the part of the alleged debtor,' 3) 'the reasonableness of the actions taken by the petitioning creditors,' and 4) 'the motivation and objectives behind filing the petition.' " Higgins, 379 F. 3d at 707; *see also* Orange Blossom Ltd. P'ship v. S. Cal. Sunbelt Developers, Inc. (In re S. Cal. Sunbelt Developers, Inc.) 608 F.3d 456, 462 (9th Cir. 2010).

Interlandi is the only petitioner. Even though Moda and Eskijian were instrumental in orchestrating the filing of the Petition, they never filed anything claiming Cadena owed them a debt; therefore, they cannot be considered petitioners. Further, Cadena is not seeking an award of

---

observers. Interlandi and those parties did not appear on camera and there was no way of knowing if these tiles adequately reflected who was viewing the Hearing.

attorney's fees, costs, and damages from Moda or Eskijian. Cadena is seeking attorney's fees, costs, and damages from Interlandi and Shemtoub. Shemtoub is the petitioning creditor's counsel, not a petitioner himself. It is unclear whether Shemtoub can be found liable under 303(i) as well. There is mixed authority on this issue. *Compare* In re Exchange Network Corp., 92 B.R. 479, fn. 1 (Dist. Colo. 1988) (petitioning creditor's counsel can be found liable under section 303(i)); In re Walden, 787 F.2d 174 (5th Cir. 1986) (no basis under 303(i) to hold a petitioning creditor's counsel liable.) The Ninth Circuit has not ruled on this specific issue, but the plain language of §303(i) seems to limit holding counsel for the petitioners responsible under that section. *See* Nw. Forest Res. Council v. Glickman, 82 F.3d 825, 830 (9th Cir. 1996) (Courts will "look first to the plain language of the statute, construing the provisions of the entire law, including its object and policy, to ascertain the intent of Congress"). Accordingly, any award under § 303(i) will only apply against Interlandi.

Interlandi filed two responses to Cadena's motion to dismiss.[4] These responses are styled as objections to Cadena's motion to dismiss but, towards the end, the responses divert from the positions taken earlier and state that Interlandi consents to dismissal. Because of the confusion, a hearing was required. At the hearing, Interlandi agreed to dismissal of the case. He now argues that this constituted consent to dismissing the case, negating grounds to pursue attorney fees and costs.

The dismissal of the involuntary bankruptcy case was because the Court granted Cadena's motion to dismiss. After submitting two responses attacking Cadena and Marquez's character, blame shifting, and threatening sanctions for filing a motion to dismiss, Interlandi ended his responses by consenting to the dismissal of this case. Consenting to dismiss an involuntary bankruptcy case in an opposition to a motion to dismiss is not sufficient consent

---

[4] *See* Response and Position of the Creditor to Motion to Dismiss Involuntary Bankruptcy (Docket 14) and Response [Reflecting an Errata to the Originally filed Response] and Position of the Creditor to Motion to Dismiss (Docket 16).

under section 303(i). *See* In re R. Eric Peterson Construction, 951 F.2d 1175, 1180 (10th Cir. 1992) (holding that "[a] more passive statement of nonopposition to the creditors' motion to dismiss the petition should not indicate consent, at least where . . . the debtor simultaneously manifests its intention to seek damages under section 303(i)"); In re Jett, 206 B.R. 407, 409 (Bankr. E.D. Va. 1997) (concluding that creditors' "nonopposition to dismissal is not consent" under § 303(i)).

Involuntary bankruptcy petitions are heavily discouraged unless they have merit. Section 303 is designed to safeguard against abuses of fraudulent and improper filings by acting as a fee shifting statute. Adopting Interlandi's position would allow most petitioning creditors in involuntary bankruptcy cases to avoid liability by merely agreeing when a purported debtor files a motion to dismiss. There was no consent between the parties at the time Cadena moved to dismiss the involuntary bankruptcy, and the motion to dismiss indicated that Cadena was going to be pursuing attorney fees and costs against Interlandi and was not waiving her right to pursue them.

Since the requirements for an award for attorney fees and costs have been met, there is a presumption that these fees and costs are reasonable. The totality of circumstances is considered when deciding whether to award fees. Interlandi attacks an award of attorney fees and costs on the grounds that Marquez sought Interlandi, Eskijian, and Moda's help in filing the involuntary bankruptcy against his wife order to stop the eviction. As previously found, this narrative is not credible. Cadena did not authorize Interlandi to file this Petition and neither Cadena or Marquez had the authority to waive the requirements of the Bankruptcy Code. Accordingly, the presumption of reasonableness has not been overcome.

Cadena's attorney fees and costs listed in Exhibit 15, which was updated on Docket 106, of $48,902.50 are reasonable considering the scope of litigation and the degree of skill that was

required under the circumstances. Interlandi engaged in a pattern of unnecessary litigation and delay tactics that unnecessarily ran up the costs. After it became clear that he was likely facing an award for attorney's fees, costs, and damages against him for filing an improper bankruptcy case, he did everything he could to try to delay this matter. As previously mentioned, after Cadena filed a motion to dismiss and request for sanctions, Interlandi filed two responses thereto. The responses do not defend the basis for commencing this case; rather, the responses personally attacked Cadena and Marquez and threatened sanctions against her and her attorney for filing a motion that they were entitled to file. It was clear even at that early stage that the Petition was meritless – Interlandi's responses to the motion to dismiss do not even defend the filing of the involuntary bankruptcy case. This baseless request for sanctions was nothing more than an attempt to intimidate Cadena into dropping her pursuit of an attorney's fee and costs award.

After the Court dismissed the case, Cadena submitted a proposed order dismissing the case. Interlandi objected to the form of order requesting the order contain language that Interlandi consented to the dismissal of the involuntary bankruptcy case. This was inconsistent with the ruling the Court made and an improper objection to the form of order. Shemtoub withdrew as Interlandi's counsel following this objection.

Interlandi hired a second attorney to represent him. Shortly thereafter, he filed a meritless motion to dismiss himself from the involuntary bankruptcy on the grounds that he was an agent of Eskijian. Docket 41. Section 303(i) is a fee shifting provision as to the petitioner and Interlandi was the only petitioner here. Interlandi's second counsel provided no legal authority to have Interlandi avoid liability based on agency as it applied to section 303(i).

Interlandi then attempted to delay the hearing. He filed late and inappropriate discovery motions, did not timely file his declaration, his witness and exhibit list, and his witnesses' declarations. Interlandi's second attorney then moved to withdraw as counsel before the second

day of the hearing. This motion was granted because Interlandi hired a third attorney a few minutes prior to the second day of the hearing. That third attorney then knew little about the proceedings so far in the case.

Interlandi also attempted to introduce inadmissible testimony. Several declarations of individuals were submitted that were not listed in Interlandi's witness list and never showed up to the hearing to be cross examined. Similarly, Interlandi sought to introduce improper evidence from Deputy Lutz. Cadena was required to incur additional fees responding to each of these situations. For these reasons, Calsada's fees and costs were reasonable. As discussed later, the fees Interlandi must pay are reduced by $8,600 as they are awarded separately as sanctions under F.R. Bankr. P. 9011. Thus, the total attorney fees and costs payable by Interlandi to Cadena are $40,302.50.

*Bad Faith*:

Any damages proximately caused by the filing of the involuntary bankruptcy petition may be awarded if there is a finding of bad faith. 11 U.S.C § 303(i)(2)(A). Similarly, "[p]unitive damages are awardable 'against any petitioner that filed the petition in bad faith.'" Wechsler v. Macke Int'l Trade, Inc. (In re <u>Macke Int'l Trade, Inc</u>), 370 B.R. 236, 256 (B.A.P. 9th Cir. 2007). "The Bankruptcy Code does not define 'bad faith' for purposes of awarding punitive damages under § 303(i)." <u>Jaffe v. Wavelength, Inc.</u> <u>(In re Wavelength, Inc.)</u>, 61 B.R. 614, 619 (B.A.P. 9th Cir. 1986). "Bad faith [is] measured by an 'objective test' that asks 'what a reasonable person would have believed.'" <u>Id.</u> at 20. "In the Ninth Circuit, the bankruptcy court can allow punitive damages without having to award compensatory or actual damages, or in addition to those damages." <u>Macke Int'l</u>, 370 B.R. at 256. There is no statutory requirement that the bad faith must be directed toward anyone in particular. <u>Wavelength</u>, 61 B.R. 620. Courts have employed a more

expansive definition of bad faith to include ill will or malice toward the debtor or its owners.  Id. There are a few examples of bad faith present here.

*False Claim* - Interlandi never was owed a debt from Cadena – either directly or through a transfer or assignment. This was not a defensible dispute over the amount or bona fides of a debt but an outright false claim.

*Summons Never Served* - Interlandi never served Cadena with a copy of the summons, notifying Cadena that an involuntary bankruptcy case was commenced against her. This shows that Interlandi had no intention of proceeding with this case in an effort to collect a debt. *See* In re Stern, 268 B.R. 390, 394 (Bankr. S.D.N.Y. 2001) (The failure to serve the summons and properly prosecute the case gives "rise to a powerful inference of bad faith").

*Previous Abuse of the Bankruptcy Code* - Interlandi is no stranger to involuntary bankruptcy petitions. *See* In re Mahvash Mazgani 2:19-bk-21655-BR; Exhibit 11. In Mazgani, Interlandi attempted to join an involuntary petition involving Moda's aunt. Interlandi previously claimed he advanced funds for Moda's benefit and attempted to collect from the aunt. Exhibit 11. Mazgani objected to Interlandi's claim. The basis for the debtor's objection to the claim was that she never owed Interlandi anything. *See* In re Mahvash Mazgani 2:19-bk-21655-BR (Docket 539). Interlandi failed to oppose the debtor's objection to claim, and his claim was disallowed. *See* In re Mahvash Mazgani 2:19-bk-21655-BR (Docket 596).  Mazgani shows that this Petition was not a one-time mistake. Interlandi is a repeat offender in asserting claims that do not exist and improperly using the Bankruptcy Courts to the detriment of others.

For all these reasons, the Petition was filed in bad faith

*Damages:*

Cadena seeks actual damages due to her loss of credit, hiring Minor to testify as a credit expert, and damages for emotional distress. Since Cadena's alleged credit score of 790 is not

credible, Cadena's request for damages based solely on her diminished credit score are not awarded. Only those damages that can be directly attributed to the filing of the Petition will be allowed. Similarly, there was no evidence that Cadena suffered any emotional damage from this ordeal distinct from the foreclosure and eviction, so no damages will be awarded for emotional distress.

Cadena seeks damages of approximately $25,000 based on loss of credit. At the time of the Petition, Cadena had several credit cards with a total credit limit of $21,500. The cards were closed when the Petition was filed, and there was an outstanding balance of $6,037 at the time they were closed. Cadena will be awarded the available credit she had available on those cards at the time the Petition was filed, $15,463.00. This figure represents actual damage she suffered.

Cadena also seeks damages because Chase Bank denied her a credit card. As previously found, the Chase Bank letter considered multiple factors, and the denial of a new line of credit is not directly a result of the involuntary bankruptcy.

Cadena also seeks compensation for her expert witness fee. Minor's invoice is for $5,862.50 and is attached to Calsada's supplemental declaration regarding his billing statement. Docket 106. These fees are reasonable and were necessary; however, they appear to be already accounted for in the attorney's fees and costs previously awarded. Therefore, an additional $5,862.50 will not be awarded.

Cadena also seeks punitive damages. This request is denied because even though the Petition was meritless and an abuse of the Bankruptcy Code, the attorney fee, costs, and actual damages award makes Cadena whole and is substantial enough to deter Interlandi from similar behavior in the future. Her choice to get involved with Moda to solve the foreclosure issue was an extremely poor one, and much of the harm to her is as a result of that rather than the

involuntary bankruptcy. The costs directly associated with the bankruptcy and the sealing of the bankruptcy file address that harm.

For all of these reasons, Cadena will be awarded $15,463 in actual damages against Interlandi in addition to the attorney fees and costs detailed earlier.

### *Rule 9011 Sanctions:*

Bankruptcy courts can award sanctions under the authority of Federal Rule of Civil Procedure 11 made applicable through Federal Rule of Bankruptcy Practice 9011. DeVille v. Cardinale (In re Deville), 280 B.R. 483, 493 (B.A.P. 9th Cir. 2002). The purpose of Rule 9011 is designed to encourage counsel to avoid a groundless filing or pleadings filed for improper purposes, primarily through the imposition of sanctions. Id.  In relevant part, Rule 9011 provides:

> (b) REPRESENTATIONS TO THE COURT. By presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,
>
> > (1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;
> >
> > …
> >
> > (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; …

Imposing sanctions under Rule 9011 requires an inquiry into the pleadings where the court considers whether the attorney signing the document made a reasonable inquiry to determine the factual and legal basis of a particular document, and whether the attorney interposed the document for any improper purpose. F. R. Bankr. P. 9011(b); see also Kyle v. Dye (In re Kyle), 2006 Bankr. Lexis 4850 *10 (B.A.P. 9th Cir. 2006). The 21-day safe harbor in the requirement does not apply where the conduct alleged is the filing of a bankruptcy petition. In re Peters & Freedman, 2021 Bankr. LEXIS 2208, *14-15 (Bankr. S.D. Cal. 2021); In re BCB Contr. Servs., LLC, 2021 Bankr. LEXIS 2552, fn. 40 (Bankr. Ariz. 2021); In re Crystal

Cathedral Ministries, 2020 Bankr. LEXIS 851, * 82 (Bankr. C.D. Cal. 2020); Goldberg v. Goodman (In re Goodman), 2013 Bankr. LEXIS 4680, *46 (9th Cir. BAP 2013). To impose sanctions under Rule 9011, the moving party must only make a showing of "objectively unreasonable conduct." *See* Miller v. Cardinale (In re Deville), 361 F.3d 539, 548 (9th Cir. 2004). "[A] finding of bad faith is not required. Davis v. Alexander (In re High Speed Music, Inc.), 2007 Bankr. LEXIS 4545 (Bankr. C.D. Cal. 2007).[5] "A sanction imposed for violation of this rule shall be limited to what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated." F.R.B.P. 9011 (c)(2).

To file an involuntary bankruptcy petition, a creditor must have some claim that a debt is owed to them and the debt is not contingent or subject to a bona fide dispute. 11 U.S.C. § 303(b)(1). Any attorney who practices in bankruptcy should be aware of the threshold requirement needed by creditors to file a proper involuntary bankruptcy petition. Similarly, bankruptcy attorneys should be aware that the consequences for filing an improper involuntary bankruptcy petition can be severe.

Shemtoub was the attorney who filed this Petition on behalf of Interlandi and thereby certified under Rule 9011 to the best of his knowledge "formed after an inquiry reasonable under the circumstances" that the information provided in the Petition had "evidentiary support, or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery." Shemtoub defends the filing of this involuntary petition first by arguing that this was an emergency filing, and he did not have time to accurately ascertain the facts.

---

[5] Initially Cadena sought these sanctions against Shemtoub in the same motion for an award for attorney fees and costs against Interlandi. A motion for sanctions pursuant to FRBP 9011 is required to be brought by a motion independent of any other motion. FRBP 9011(c)(1). This concern was raised at an earlier hearing. Cadena subsequently brought a separate motion.

Shemtoub never saw evidence of the claim; he claimed that Eskijian would provide it at a later time, but he did not. Given the severe consequences for filing an improper involuntary bankruptcy petition, any attorney should have made more of an inquiry and even required that some proof be turned over before the petition could be filed. Despite practicing in bankruptcy for over a decade, Shemtoub filed this Petition without even checking if there were a real debt – let alone confirming whether it was noncontingent and not subject to a bona fide dispute. This is an elementary, but important part of filing a proper involuntary bankruptcy petition. An emergency does not alleviate an attorney from doing some due diligence.

Shemtoub's rationale treats an involuntary petition as though it were no more than a placeholder permitted to interfere in other lawful court proceedings simply because someone requested it, even calling it a "noble deed." Docket 117: 1. There is no recognition that an involuntary bankruptcy petition is a lawsuit against someone, alleging that they are not paying their debts when they become due. It can have significant consequences for the putative debtor and should not be treated so casually.

Secondly, even if an emergency did justify the lack of any diligence, the circumstances indicate Shemtoub was on actual notice of red flags requiring further investigation. Shemtoub's representation of EIJ in the State Court Case prior to the filing of the Petition gave him more extensive knowledge about what occurred prepetition and greater reason and ability to verify the information listed in the Petition. Given the nature of the allegations there, Shemtoub was aware of the issues pertaining to the Property and Eskijian's concerns about Vista Land well before filing the Petition. Despite knowing the facts and circumstances surrounding the Property before filing the Petition, Shemtoub either filed the Petition knowing that it was meritless at the outset or failed to do any due diligence despite serious red flags of, at best, an abusive filing, and, at worst, fraud.

Leaving question 12 in the Petition blank is another indication that Shemtoub had no reasonable factual basis to believe the Petition was legally valid. Shemtoub argued that "Mr. Eskijian appointed Mr. Interlandi as his agent to collect a debt owed to Mr. Eskijian's company, EIJ." Docket 93 at 2.  Question 12 asks "Has there been a transfer of any claim against the debtor by or to any petitioner?" The involuntary petition form is short – only 13 questions. If Shemtoub believed Eskijian transferred the claim to Interlandi, then he should have checked question 12 indicating that Interlandi's claim had actually been transferred to him. If he believed Interlandi was simply acting as a collection agent, he knew there was no basis for Interlandi to be the petitioner. The nature of the debt is a threshold issue for the filing of an involuntary petition. It is not simply a convenient method to obtain an automatic stay for whatever purposes a party wishes.

Shemtoub also argued in the response to the motion to dismiss (Docket 16) that he and his client were completely justified in filing the bankruptcy because Marquez had asked for his help in avoiding eviction. He argued that he was helping them reclaim their home, and was doing them a favor by filing an involuntary case against Cadena, and, once the involuntary bankruptcy was filed, they turned on him. His response to the motion to dismiss refers to the "irony of events" in the filing of the involuntary case and argues that '[t]he service brilliantly blinds itself to the brotherly love given to the Debtor and her family by the Creditor and his master."[6] Although he stated the "Petition is readily admitted as being insufficiently drafted to sustain an Order for relief… " (Docket 16:7-8) , he also argues that had Interlandi known they would turn

---

[6] The court has already addressed the tone of the brief at the hearing and will not sanction further based on it. The brief refers to Cadena's alleged reversal of position and calls her "a Jezebel unworthy of any credence." Docket 16 at 13. Counsel are free to advocate forcefully for their positions, but this phrase is considered a sexist and racist slur and should never be used in a pleading. *See, e.g.* McKinley v. Salvation Army, 192 F. Supp. 3d 678, 682 (W.D. Va 2016) aff'd 685 Fed Appx 227 (4th Cir. 2017) (citing the use of such phrase and other actions as forming a hostile work environment.) C.1 of the Civility and Professionalism Guidelines | Central District of California | United States District Court (uscourts.gov) provide that "We will speak and write civilly and respectfully in all communications with the court."

on them he "would not have entertained taking one step in any effort to appease a client who concerned himself with the welfare of a false friend and judas." While this response is somewhat nonsensical, it essentially complains that Shemtoub understood the involuntary petition to be a ruse and that he believed he was colluding with the putative debtor simply to stop an eviction and not because noncontingent undisputed debts were owed by Cadena to Interlandi. Putting aside whether or not these claims are true, the defense is simply (1) the petitioner and his attorney believed Cadena was in agreement with the ruse and (2) Cadena's husband told them they should file it against his wife.

To defend an otherwise meritless involuntary petition on the basis that it was collusive simply admits to the improper use of the bankruptcy laws. In re Mi La Sul, 380 B.R. 546, 556 (Bankr. C.D. Cal. 2007) (collusive bankruptcies with no intent to collect an unsecured debt are improper us of Bankruptcy Code.) See also In re Forever Green Athletic Fields, Inc., 804 F.3d 328, 336-37 (3d Cir. 2015) ("Courts routinely find it improper for creditors to use the bankruptcy courts to gain a personal advantage in other pending actions or as a debt-collection device."); In re Dami, 172 B.R. 6, 10 (Bankr. E.D. Pa. 1994) (where "the purpose of the bankruptcy filing is to defeat state court litigation...bad faith exists."); In re St. Marie Dev. Corp. of Montana, Inc., 334 B.R. 663, 671 (Bankr. D. Mont. 2005) (finding bad faith where there was pending state court litigation between the parties); In re WLB-RSK Venture, 296 B.R. 509, 515 (Bankr.C.D. Cal. 2003) (involuntary petition dismissed that was filed as a litigation tactic), aff'd, 320 B.R. 221 (B.A.P. 9th Cir. 2004), aff'd, 223 F. App'x 555 (9th Cir. 2007).

Judges have considerable discretion in the choice of what sanctions are appropriate under Rule 11. See Business Guides v. Chromatic Communications Enters., 892 F.2d 802, 808 (9th Cir. 1989). Rule 11 does not enumerate a specific set of factors courts must consider in deciding what sanctions are appropriate but some of the factors used to consider what the appropriate

sanctions should be are: deterrence, harassment of the opposing party, and reasonableness of attorney's fees. <u>Filippini v. Austin</u>, 106 F.R.D. 425, 433 (C.D. Cal. 1985).

Cadena seeks to have Shemtoub joint and severally liable for the attorney fee award against Interlandi. A few courts have held attorneys jointly and severally liable for the damages for filing improper involuntary petitions. *See e.g.* <u>Landon v. Hunt</u>, 977 F.2d 829 (3rd Cir. 1992) (affirming joint and several liability under FRBP 9011 for filing an involuntary where petitioning creditor has no claim against the debtor); <u>Keiter v. Stracka</u>, 192 B.R. 150 (S.D. Tex. 1996) (affirming joint and several liability under FRBP 9011 for filing an involuntary petition without adequately researching and investigating the basis for the filing). The Ninth Circuit takes a more nuanced approach. In <u>In re Southern California Sunbelt Developers, Inc.</u>, 608 F.3d 456 (9th Cir. 2010), the bankruptcy court held individuals who exercised control over the petitioning creditors jointly and severally liable for damages that it awarded after it dismissed the involuntary bankruptcy case. <u>Id.</u> at 460. The Ninth Circuit affirmed in part and reversed in part the bankruptcy court's decision to grant joint and several liability under FRBP 9011. <u>Id.</u> at 467. The Ninth Circuit found that joint and several liability was appropriate up until the involuntary case was dismissed. Liability for fees and costs incurred in post-dismissal litigation are not appropriate for a non-petitioner. <u>Id.</u>

Holding Shemtoub liable for a portion of the attorney fee award leading solely to dismissal of the case is appropriate as a sanction under Rule 9011 and reasonable as Shemtoub stopped representing Interlandi shortly after the case was dismissed. Based on Calsada's supplemental declaration, the fees and costs incurred seeking dismissal of the case were $17,200. Docket 106. Shemtoub is sanctioned one half that amount, $8600, for facilitating his client's abuse of the bankruptcy laws in this way. That amount has been deducted from the amount Interlandi owes Cadena and should be payable directly to her attorney.

***Sealing Involuntary Bankruptcy Petition:***

The final relief sought by Cadena is to seal any and all records relating to the Petition. According to 11 USC § 303(k)(1):

> If—
> (A) the petition under this section is false or contains any materially false, fictitious, or fraudulent statement;
> (B) the debtor is an individual; and
> (C) the court dismisses such petition, the court, upon the motion of the debtor, shall seal all the records of the court relating to such petition, and all references to such petition.

The Petition included materially false information regarding the alleged debt the Petition stated Cadena owed. Cadena is an individual and sought relief under section 303(k) by way of motion. All of the elements for sealing all the records relating to the Petition have been satisfied. Accordingly, the Petition and all the records relating thereto are sealed. Any reference to this bankruptcy petition in any credit report must be deleted.

***Conclusion:***

For all the reasons stated above, Cadena is awarded $55,765.50 in attorney's fees, costs, and damages against Interlandi. Cadena is also awarded $8,600.00 in sanctions against Shemtoub, payable directly to her attorney. Finally, all records relating to the Petition shall be sealed pursuant to section 303(k). Cadena shall submit an order consistent with this ruling within fifteen (15) days of the issuance of this memorandum.

###

Date: January 6, 2022

Maureen A. Tighe
United States Bankruptcy Judge

-25-